UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
ROSA MARIBEL GUIJA,

                           Plaintiff,

          -against-

COMMISSIONER OF SOCIAL SECURITY,

                           Defendant.
----------------------------------------------------------------x

MEMORANDUM & ORDER

16-CV-5605 (ENV)

VITALIANO, D.J.

      Plaintiff Rosa Maribel Guija requests review, pursuant to 42 U.S.C. § 405(g), of a final decision of the Commissioner of Social Security ("the Commissioner"), denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("the Act"). The parties have cross-moved for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Commissioner's motion is denied, and plaintiff's cross-motion is granted to the extent that this matter is remanded for further proceedings consistent with this opinion.

## Procedural History

      On March 27, 2013, Guija filed applications for DIB and SSI, alleging a disability onset date of February 27, 2008. (Record, ECF No. 11 ("R."), at 162-72). She claimed that she was not able to work because of upper and lower back pain; pain with numbness; a tingling sensation in her right arm, right hip and right knee and radiating to her lower extremities; tightness; muscle spasms; swelling/edema; muscle tenderness; abnormal gait; and post-traumatic stress disorder. (R. at 584-98). All of these conditions and symptoms were reported by her treating physician, Dr. Mohammad Shahidul Islam. (*Id.*). She further claimed that her pain is aggravated by bending, lifting, walking and climbing. (R. at 584).

1

The Social Security Administration ("SSA") denied her applications on June 13, 2013. (R. at 67). On July 24, 2013, Guija requested administrative review, which took place on April 14, 2015, at a hearing before Administrative Law Judge ("ALJ") Jerome Hornblass. (R. at 34, 77-78). The ALJ denied plaintiff's claim on June 11, 2015. (R. at 7-28). Guija's request for review of that decision was denied by the Appeals Council, on June 29, 2015. (R. at 1-6). This action followed.

## Background

Guija was born on November 2, 1971. (R. at 162). She moved to the United States in 1990 and became a naturalized citizen. (R. at 164). She has a high school education and completed two years of college. (R. at 191). From 1997 through February 27, 2008, Guija worked as a salesperson in a department store. (R. at 190-91). The record reflects that she can speak, read and write English. (R. at 36, 310). She testified that she had stopped working due to problems in her neck, back, arms, hips and knees, all of which resulted from a slip and fall accident at her workplace. (R. at 37, 44). Since the accident, she has experienced pain and numbness in her back and lower extremities and has taken pain medication to alleviate these symptoms. (R. at 40). She had an epidural in her neck and received arthroscopic surgeries on both of her knees. (R. at 38-42). Guija also testified that she could not stand or sit at one time for very long, could not lift heavy objects and felt a lack of strength when trying to do housework. (R. at 42-43). Specifically, she testified that she could only stand for 10 to 15 minutes, or sit for 30 minutes, at one time, and lift nothing heavier than a gallon of milk. (*Id.*). Additionally, she claimed that she had problems bending or kneeling due to the pain in her back and knees. (R. at 43-44).

2

Guija also complained at the ALJ hearing of sleeping problems, depression, forgetfulness and difficulty in concentration. (R. at 44-47). Guija, however, testified that she is able to take a bath by herself every day (with some difficulty in bending to wash her feet due to back pain), use public transportation, use the toilet, dress herself (with some difficulty in putting on her socks and shoes due to back pain), cook "small things" and feed herself. (R. at 42-43, 45; *see also* R. at 200).

In addition, the record shows that Guija takes care of her three-year-old and nine-year-old daughters in daily activities such as cooking, feeding and bathing, changing diapers, house cleaning, dish washing and taking her daughters to, and picking them up from, school, while receiving some help from her mother. (R. at 40, 200-02). A third-party functional report prepared by an SSA entitlement case specialist likewise indicates that Guija cares for her two daughters without the help of any other person, cooks light meals at least three times per week[1] and goes outside on her own to shop in stores. (R. at 219-21). The report was prepared, in part, based on Guija's statements concerning her disability and daily activities.

## Medical Evaluation

On February 27, 2018, Guija suffered from a slip and fall accident at her workplace. (R. at 434). She was first examined by Dr. Islam, her treating physician, on March 1, 2008. (R. at 454). Dr. Islam observed a decreased range of motion and tenderness on Guija's lumbar spine and right hip, with impaired gait, and he diagnosed her with traumatic thoracic pain syndrome,

---

[1] The third-party functional report contains contradictory information on Guija's ability to cook. On the same page, it suggests both that Guija cooks light meals at least three times per week, with each meal taking 35 minutes to prepare, and that Guija "cannot cook due to being unable to stand on her feet longer than 5 minutes." (R. at 220). The entitlement case specialist who prepared the report left unchecked the "yes" or "no" box concerning whether Guija prepares her own meals. (*Id.*).

3

traumatic low back pain, sprained/strained hip, wrist contusion, elbow pain and internal derangement in her right knee. (R. at 456-57). In Dr. Islam's initial and follow-up evaluations of Guija, from March 1, 2008 through April 10, 2015, he concluded that Guija was either "partially disabled" or "totally disabled" and "may not return to work." (R. at 431-57, 584-96). Additionally, in a report submitted to the SSA, dated August 13, 2013, Dr. Islam stated that Guija could not lift or carry more than ten pounds, could not push or pull, could not use standard public transportation,[2] could not go shopping, must use a cane to ambulate and had various environmental limitations, such as an inability to tolerate moving or exposure to unprotected height. (R. at 503-08).

Guija was also evaluated by Dr. Mehran Manouel, her treating orthopedist, multiple times after her injury. Dr. Manouel reported right knee meniscus tear, lumbar spine sprain, mild medial joint narrowing, as well as pain to palpation and limited motion in Guija's knee and lumbar spine. (R. at 280-91, 554-61). He determined Guija's disability status to be "Total" in the earliest evaluation on record, dated September 9, 2008, as well as in all subsequent evaluations from October 27, 2008 through April 12, 2013. (*Id.*). As concerned a treatment plan, Dr. Manouel recommended physical therapy and arthroscopic knee surgery. (*Id.*). Dr. Manouel examined Guija three more times from May 31, 2013 through September 11, 2013, and adjusted Guija's disability status to "mild to moderate." (R. at 558-61).

The record contains other assessments and evaluations that portray a different story. On June 19, 2008, Dr. Arnold T. Berman performed a consultative examination on Guija to evaluate her disability status for purposes of determining her eligibility for worker's compensation

---

[2] Although Dr. Islam stated that Guija could not use standard public transportation, he also indicated that Guija could travel without a companion for assistance. (R. at 508).

4

benefits. (R. at 273-77). In addition to a physical examination, Dr. Berman also reviewed Guija's lumbar MRI report of April 9, 2008, multiple reports from Dr. Islam and multiple physical therapy reports. (R. at 274). Disagreeing with Dr. Islam, Dr. Berman concluded that Guija was not disabled and could "participate in all activities of daily living" and "return to work to full active duty and regular employment, without restrictions." (R. at 276).

Dr. Berman re-examined Guija on October 16, 2008, and reached the same conclusion but, after reviewing an MRI report dated July 22, 2008, indicated that Guija had diffuse degenerative changes throughout the lumbar spine. (R. at 268-72). On March 19, 2009, after another examination, Dr. Berman concluded that Guija suffered from "mild disability" because of the worsening of her lumbar degenerative condition and newly developed radiculopathy. (R. at 267). As a result of this "mild disability," Dr. Berman recommended that Guija's lifting at work be limited to 25 pounds. (*Id.*). Dr. Berman re-examined Guija three more times, on April 15, September 2 and December 16, 2010, and concluded in all of those examinations that Guija had no further disability and could return to work without any restriction. (R. at 253, 258, 263).

In the meantime, on November 17, 2010, Dr. Stephan Simons performed a general medical examination on Guija and reported that Guija had normal strength, normal gait and intact recent and remote memory. (R. at 235). She had "good exercise tolerance" and was able to do "usual activities." (R. at 234). Dr. Simons re-examined Guija on December 1, 2010, and had the same observations. (R. at 237-38). The record indicates that Guija complained about numbness and tingling in her neck and throughout her body in the examination on November 17, 2010. (R. at 234). However, Dr. Simons's notes do not indicate that Guija made any similar complaint in the examination on December 1, 2010, about two weeks after the first examination,

although she continued to complain that her "vein hurt" and felt uncomfortable under her skin. (R. at 237).

On October 22, 2012, Dr. David Weiss, Guija's primary care physician, performed a general medical examination on Guija and had the same observations that Dr. Simons had in his December 1, 2010 examination. Specifically, Dr. Weiss reported "[n]ormal strength," "[g]ait WNL"[3] and "[r]ecent and remote memory intact." (R. at 242). On December 4, 2012, Dr. Issac Cohen performed another independent evaluation on Guija to determine her entitlement to worker's compensation. He concluded that Guija needed no further medical treatment or diagnostic testing, had reached "maximum medical improvement" and was "capable of working on a full-time unrestricted basis." (R. at 249). He also stated that Guija was "currently a housewife taking care of her children." (R. at 247).

On February 11, 2013, after a consultative medical examination, Dr. Mohammad Shuja stated, in a medical report prepared by the Federation Employment & Guidance Service ("FEGS"), that Guija did not have any work limitation in sitting, standing, walking, climbing, grasping or reaching. (R. at 304-05). Her only work limitations involved pulling and kneeling for less than one hour, as well as an inability to bend. (R. at 305). In the same report, the FEGS social worker indicated that, according to Guija's self-report of her daily activities, Guija stayed at home and took care of her children. (R. at 298). She also could wash clothes and dishes, sweep and mop the floor, make her bed, shop for groceries, cook meals, bathe, get dressed and use the toilet. (*Id.*).

---

[3] "WNL" means "within normal limits." *See WNL*, <u>Free Dictionary</u>, *available at* https://medical-dictionary.thefreedictionary.com/WNL (last visited Aug. 8, 2019).

On May 13, 2013, Guija was referred to Dr. Iqbal Teli by the Division of Disability Determination for a consultative internal medicine examination. (R. at 480). Dr. Teli reported that Guija had a "mild restriction" in squatting, bending and prolonged walking and climbing. (R. at 482). He also determined that the cane previously prescribed for and used by Guija to balance while going out was not medically necessary. (R. at 481). On the same date, Dr. David Mahony performed a psychiatric evaluation on Guija and diagnosed her with moderate major depressive disorder. (R. at 478). However, he stated that Guija's psychiatric problems "do not seem to interfere with [her] ability to function on a daily basis." (*Id.*).

## Medical Treatment

On March 1, 2008, the day after her slip and fall, Guija went to Dr. Islam's office for an initial evaluation and diagnosis. (R. at 512-15). She did not visit an emergency room immediately after the accident. (R. at 273). Dr. Islam recommended a treatment plan including medication and physical therapy. (R. at 515). As a result, Guija received physical and chiropractic therapy on her back until approximately April 15, 2009, and physical therapy on her knee throughout 2010. (R. at 260). Dr. Berman, however, stated that Guija should stop her ongoing physical and chiropractic therapy since these treatments were, in his opinion, unnecessary and excessive. (R. at 253-76). For example, in his Practitioner's Report of Independent Medical Examination dated April 26, 2010, Dr. Berman stated that "the claimant is still receiving physical therapy . . . however, this can now be discontinued in regard to the right knee." (R. at 262). Further, in his report dated September 13, 2010, while noting that Guija was "now still receiving physical therapy," Dr. Berman stated that "the claimant has had adequate treatment." (R. at 258). In his next report, dated January 7, 2011, Dr. Berman emphasized that

7

"[p]hysical therapy has been excessive and should be discontinued. Maximum medical improvement has occurred effective this examination." (R. at 253).

Guija underwent right knee arthroscopic surgery on March 3, 2010, and left knee arthroscopic surgery on February 12, 2013. (R. at 278, 285). She received an epidural injection on her neck in May 2013. (R. at 47, 476). She also received psychiatric treatment beginning in 2010. (R. at 45, 238-39).

## The ALJ's Determination

The ALJ concluded that, considering Guija's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform. (R. at 27). The ALJ reached this conclusion by applying Medical-Vocational Guidelines ("Grids") 201.28 to Guija's residual functional capacity, which, in her case, covered the full range of sedentary work. (R. at 28). The Grids thus directed a finding of "not disabled," given Guija's specific vocational profile. (*Id.*).

In making the determination that Guija had the residual functional capacity to perform the full range of sedentary work, the ALJ gave great weight to the findings of the consultative examiners – Drs. Berman, Cohen and Teli – and the FEGS doctor, hospital physician Dr. Shuja, stating that their detailed findings supported at least a "sedentary" residual functional capacity, if not a "light" residual functional capacity, which is less limiting. (R. at 26). On the other side of the ledger, the ALJ gave little weight to the opinions of Dr. Islam, Guija's treating physician, calling his opinions "against the weight of the evidence and the findings of the other medical experts." (R. at 26-27). He also found that Guija's testimony concerning the intensity, persistence and limiting effects of her symptoms was not credible because of her inconsistent statements to the consultative examiners, the FEGS social worker and other parties; specifically,

8

the ALJ cited Guija's reluctance to admit to Drs. Mahony and Teli that she had been taking psychiatric medication since 2010, and her statements to the FEGS social worker that she took care of her children and was "not interested in working." (R. at 20).

Critically, before applying the Grids to Guija's vocational profile, the ALJ held that Guija's medically determinable mental impairment of major depressive disorder was not "severe." (R. at 17). The ALJ found that Guija's mental impairment had no more than a mild limitation on her daily activities, social functioning and mental functioning, and he pointed to Guija's statements concerning her daily and social activities and cooking abilities, as well as Dr. Berman's, Dr. Cohen's and Dr. Mahoney's physical and psychiatric evaluations. (*Id.*).

## Standard of Review

Section 405(g) of the Act empowers district courts to review a disability decision of the Commissioner and affirm, reverse or modify it "with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g); *see Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004). When evaluating a determination by the Commissioner to deny a claimant disability benefits, a reviewing court may reverse the decision only if it is based upon legal error or if the factual findings are not supported by substantial evidence. *Lockwood v. Comm'r of Soc. Sec.*, 914 F.3d 87, 91 (2d Cir. 2019) (citing 42 U.S.C. § 405(g)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971)).

Case law also cautions courts to "keep[] in mind that it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998); *see also Watson v. Berryhill*, 732 F. App'x 48, 51 (2d Cir. 2018)

9

(summary order). When evaluating the evidence, "'[t]he court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991); *see also Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) (ALJ's medical conclusion "overlooked the facts in the record and, more egregiously, constituted an improper substitution by the ALJ of her own lay opinion in place of medical testimony").

Nonetheless, if "there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have [his] disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

## Discussion

### I. Entitlement to Benefits

A "disability" justifying DIB or SSI benefits exists if the claimant demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has adopted a five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520. The Second Circuit describes the process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider his disabled without considering vocational factors such as age, education, and work experience .... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)). Although the claimant bears the burden of proof as to the first four steps, the burden shifts to the Commissioner at the fifth step. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

In applying the five-step process, an ALJ must consider "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983)); *see also Cammy v. Colvin*, No. 12-CV-5810 (KAM), 2015 WL 6029187, at *10 (E.D.N.Y. Oct. 15, 2015). Where the information in the record is inconsistent, the Commissioner can weigh the relevant evidence to determine whether the claimant is disabled. 20 C.F.R. § 404.1520b(b). The ALJ need not address every conflict in the record, but "the crucial factors in any determination must be set forth with sufficient

specificity to enable [the court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

II. Application of the Grids

Guija first argues that the ALJ erred in applying the Grids when the ALJ did not incorporate her mental impairment into the residual functional capacity assessment and asserts that "it is impossible to know without a [vocational expert] consultation whether there are jobs that Plaintiff is able to do." (Pl. Mem., Dkt. 21, at 7). Essentially, she argues that the ALJ, instead of relying exclusively on the Grids in step five of the sequential evaluation process, should have consulted with a vocational expert on the question of whether there are jobs existing in significant numbers in the national economy that accommodate Guija's residual functional capacity and vocational factors. (*Id.*). Guija bases this argument on two grounds: first, she contends that the ALJ should have considered, but failed to consider, both severe and non-severe impairments when assessing her residual functional capacity; and, second, she argues that the ALJ's determination that her mental impairments were non-severe is not supported by substantial evidence. (*Id.* at 6-7).

To improve the uniformity and efficiency of determinations at step five of the sequential evaluation process, the Grids were developed to help establish whether there are jobs existing in significant numbers in the national economy that a claimant can perform. *See Heckler v. Campbell*, 461 U.S. 458, 461, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983); 20 C.F.R. Pt. 404, Subpt. P, App. 2. "They consist of a matrix of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Heckler*, 461 U.S. at 461-62. If the claimant's physical ability enables him or her to

perform all or substantially all of the exertional demands of work at a given functional level, the Grids direct a conclusion of either "disabled" or "not disabled," eliminating the need for vocational expert testimony and improving consistency in treatments of similarly situated claimants. *See id.*; see also SSR 83-11. There are five functional levels: sedentary, light, medium, heavy and very heavy. § 200.00(b), 20 C.F.R. Pt. 404, Subpt. P, App. 2.

"When the claimant cannot perform substantially all of the exertional demands of work at a given functional level and/or has non-exertional limitations, the medical-vocational rules are to be used as a framework for decisionmaking unless there is a rule that directs a conclusion of 'disabled' without considering the additional exertional and/or non-exertional limitations." *See Anninos v. Colvin*, No. 13–CV–3133 (SJF), 2015 WL 5794055, at *7 (E.D.N.Y. Sept. 30, 2015) (quoting SSRs 83-12 and 83-14). By definition, sitting, standing, walking, lifting, carrying, pushing and pulling are considered "exertional" functions and all other functions, including mental functions like understanding and remembering, are considered "non-exertional." 20 C.F.R. §§ 404.1569a(b), 416.969(b).

Guija's argument centers on whether and when the Grids can be relied on exclusively to direct a conclusion of "disabled" or "not disabled" at step five of the sequential evaluation, without the need to consider the testimony of a vocational expert. Case law in the Second Circuit holds that, after determining a claimant's residual functional capacity, an ALJ is not necessarily precluded from using the Grids exclusively at step five of the sequential evaluation process, even if the claimant complained about non-exertional impairment. *See Zabala v. Astrue*, 595 F.3d 402, 410-11 (2d Cir. 2010) ("[T]he 'mere existence of a non-exertional impairment does not automatically . . . preclude reliance on the guidelines.'") (quoting *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986)); *see also Martes v. Comm'r of Social Security*, 344 F.

Supp. 3d 750, 769 (S.D.N.Y. 2018) ("An ALJ is not precluded from exclusively using the Grids.").

Importantly, however, if "a claimant has non-exertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." *Id.* at 410; *see also Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) ("In particular, 'sole reliance on the [g]rid[s] may be precluded where the claimant's exertional impairments are compounded by significant non-exertional impairments that limit the range of sedentary work that the claimant can perform.'"). "A non-exertional impairment 'significantly limit[s]' a claimant's range of work when it causes an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" *Zabala*, 595 F.3d at 411.

Guija is, therefore, correct in arguing that the ALJ was required to consider both her severe and non-severe impairments when assessing her residual functional capacity. The ALJ discussed the reasons why Guija's mental impairments, in his opinion, were not "severe" in step two of the sequential evaluation process, by applying the so-called "Paragraph B Criteria" to Guija's mental impairments. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.06(B), 12.07(B). Having determined that Guija's mental impairment "causes no more than 'mild' limitation" in activities of daily living, social functioning and concentration, persistence or pace, (R. at 17), and assuming that such a determination is supported by substantial evidence, the ALJ was not required to consult with a vocational expert in step five of the sequential evaluation process.

The pivotal question, then, is whether that assumption is well-founded; in other words, whether the ALJ's determination that Guija's mental impairments were not "significantly limiting" is supported by substantial evidence. Guija argues that her "mildly impaired recent and

remote memory skills during the psychological consultative examination" satisfies the *de minimis* severity threshold. (Pl. Mem. at 6).[4] To be fair, in his recitals, the ALJ states that he considered the degree of limitation that Guija's mental impairments imposed on her daily activities, social functioning and concentration, persistence and pace, as well as any episode of "decompensation" of extended duration that Guija might have experienced. (R. at 17). The ALJ also considered a FEGS report highlighting various activities that Guija did on a daily basis, such as cooking, using public transportation and taking care of her children, (R. at 17, 297-98), as well as Dr. Berman's opinion that Guija could participate in all activities of daily living and Dr. Cohen's report that Guija took care of her children. (R. at 17, 247, 271). In the area of social functioning, the ALJ considered the FEGS report, which shows that Guija maintains contact with her family, her friends and some religious organizations. (R. at 17). On these recited evaluations, the ALJ found "mild" limitation in the area of concentration, persistence or pace, quoting Dr. Mahony's opinion that Guija's psychiatric problems "do not seem to interfere with [her] ability to function on a daily basis." (R. at 17, 478).

Critically, though, "[a]s the Second Circuit has noted several times, a claimant need not be an invalid to be found disabled under the Social Security Act." *Jackson v. Comm'r of Soc. Sec.*, No. 17-CV-916, 2019 WL 2123566, at *5 (W.D.N.Y. May 15, 2019) (internal quotations omitted) (citing *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998)); *see also Aubef v. Schweiker*, 649 F.2d 107, 113 (2d Cir. 1981) (holding that ability to drive a car, shop and visit with wife are not inconsistent with allegation of painful back injury); *Harrison v. Berryhill*, No.

---

[4] Although it does not impact the decision, Guija's reliance on *Dixon v. Shalala*, 54 F.3d 1019, 1032 (2d Cir. 1995), is misplaced because the ALJ did not "screen out" Guija's disability claims in step two of the process but rather determined that Guija had "severe" impairments and proceeded to steps three through five. (R. at 16).

15

16-CV-7220 (KMK), 2019 WL 580748, at *5 (S.D.N.Y. Feb. 13, 2019) ("[W]hen a claimant 'gamely chooses to endure pain in order to pursue important goals, such as basic daily activities, it would be a shame to hold this endurance against her in determining benefits unless her conduct truly showed that she is capable of working.'").[5]

Perhaps even more problematic, the ALJ erred not in considering Guija's activities of daily life, but in failing to give appropriate weight to Guija's own statements concerning the severity and limiting effects of her mental impairments. (Pl. Mem. at 7). In assessing the credibility of a claimant's subjective complaints, the Commissioner's regulations require ALJs to employ a two-step inquiry. *See, e.g., Yu v. Astrue*, 963 F. Supp. 2d 201, 217 (E.D.N.Y. 2013). "First, the ALJ must determine whether the claimant suffers from a medically determinable impairment or impairments that could reasonably be expected to produce" his or her symptoms. *Turkus v. Astrue*, No. 11–CV–3887 (FB), 2012 WL 3877617, at *3 (E.D.N.Y. 2012) (quoting 20 C.F.R. § 404.1529(b)). "Second, the ALJ must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's [subjective] contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010) (summary order) (quoting 20 C.F.R. § 404.1529(c)(3)(i)–(vii)).

The ALJ did not properly apply the two-step inquiry to Guija's subjective complaints. Concluding that Guija's medically-determinable impairments could reasonably be expected to

---

[5] Dr. Islam indicated in his medical report that Guija could not use standard public transportation. (R. at 508). Dr. Mahony reported that Guija "traveled to the evaluation on her own by subway," (R. at 476), and the FEGS report indicates that Guija "reports that she cooks at least three times a week." (R. at 220). On the same page, however, it also indicates that Guija "reports that she cannot cook due to being unable to stand on her feet longer than 5 minutes," (*id.*), and Guija stated that she could stand "maybe 10, 15 minutes" at one time when asked at the ALJ hearing.

16

cause some of her alleged symptoms – *i.e.* that the first prong was satisfied – the ALJ nonetheless determined that her statements concerning the intensity, persistence and limiting effects of these symptoms were not credible. (R. at 20). The ALJ was especially concerned that Guija had not worked since her injury but was able to perform various daily activities for self-care and the care of her children. (*Id.*). Moreover, the ALJ pointed to Guija's inconsistent statements to the consultative examiners, FEGS social worker and other parties, including her reluctance to admit her mental impairments and psychiatric treatment to various examiners. (*Id.*). As Guija argued, however, those inconsistencies could be explained by the fact that she did not have the assistance of a Spanish interpreter when meeting with the consultative examiners and the "cultural context of [her] Latino culture," in which there is "an increased stigma around mental health issues" and additional "simple misunderstandings." (Pl. Mem. at 9-10). Indeed, her reluctance to acknowledge conditions that would *support* a finding of disability is more indicative of credibility than a lack of candor.

To be sure, case law cautions that, when evaluating evidence, "[t]he court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Jones v. Sullivan*, 949 F.2d at 59 (2d Cir. 1991) (citation omitted). In the context of credibility assessment, "the ALJ, who has the 'opportunity to observe witnesses' demeanor, candor, fairness, intelligence and manner of testifying,' is 'best-positioned to make accurate credibility determinations.'" *Walker v. Comm'r*, No. 6:17-CV-06403 EAW, 2019 WL 989343, at *5 (W.D.N.Y. Feb. 25, 2019); *see also Snell v. Apfel*, 177 F.3d 128, (2d Cir. 1999) (citation omitted) ("After all, the ALJ is in a better position [than the Commissioner] to decide issues of credibility."). Even so, there are circumstances, like those here, when an ALJ's credibility determination is patently unreasonably in light of the

17

objective medical evidence. And, the problems in the ALJ's decision-making were compounded by the fact that the record was not adequately developed with the testimony of a vocational expert.

In short, given the medical evidence of record – and the absence of medical records and testimony regarding treatment for Guija's mental impairments – a full record would have clearly shown that Guija may have had "severely limiting" mental impairments, which would have required the ALJ to consult with, and consider the advice of, a vocational expert. Had a full record been properly developed, there is strong reason to believe it would be consistent with Guija's own testimony and in harmony with the medical evidence otherwise part of the record. Because of this compound error in reaching a decision, the Court cannot be satisfied with the ALJ's legal conclusion, and remand is warranted.[6]

---

[6] Worse yet, in violating the treating physician rule, it appears that the ALJ did not explain why the views of Guija's treating sources, Drs. Islam and Gopal, were not given "controlling weight." Even so, the Court need not and does not evaluate this alternative ground for remand.

## Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied and Guija's cross-motion is granted to the extent that the final order of the Commissioner is vacated and the matter is remanded to the Commissioner for further administrative proceedings consistent with this Order.

The Clerk of Court is directed to enter judgment accordingly and to close this case for administrative purposes.

So Ordered.

Dated: Brooklyn, New York
August 31, 2019

s/Eric N. Vitaliano
_____
ERIC N. VITALIANO
United States District Judge